UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PUBLIX SUPER MARKETS, INC.,

     Plaintiff,

v.

                                 CASE NO.: 3:24-cv-00864-MMH-MCR

SNYDER'S-LANCE, INC.;
HARTFORD
FIRE INSURANCE COMPANY; and
THE CONTINENTAL INSURANCE
COMPANY,

     Defendants.
_____/
SNYDER'S-LANCE, INC.,

     Third-Party Plaintiff,

v.

M. MONAHAN DISTRIBUTORS, LLC,

     Third-Party Defendant.
_____/

**THIRD-PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Third-Party Defendant, M. MONAHAN DISTRIBUTORS, LLC ("Monahan" or "Defendant"), by and through the undersigned counsel, hereby moves this Honorable Court for entry of a Final Summary Judgment in its favor pursuant to Federal Rule of Civil Procedure 56, Local Rule 3.01, and this Court's Case Management Order on the grounds that the pleadings, depositions, affidavits, and answers to interrogatories in the record show that there is no genuine issue as to any

material fact and Monahan is entitled to the entry of judgment in its favor as a matter of law. In support of this motion, Monahan states as follows:

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. This lawsuit arises from a slip and fall on a transitory foreign substance in a Publix supermarket. (D.E. 22).

2. More specifically, on November 20, 2017, Jeremiah Cooks, who was at a store owned and operated by Publix Super Markets, Inc. ("Publix"), stocking the products of Snyder's-Lance ("S-L"), slipped and fell on a wet floor in the back stockroom, sustaining personal injuries. (D.E. 22, ¶¶17-20).

3. Although Mr. Cooks was stocking the products of S-L, he was not employed by S-L but was an agent of Monahan. (D.E. 59, ¶15).

4. The uncontested record evidence is that Cooks was not a Monahan employee, but an independent contractor. (See attached Exhibit 1, 13:3-6; 33:6-34:8; 37:14-23; 38:11-23; 55:14-56:20; 65:15-66:1).

5. Even S-L's corporate representative acknowledges that Mr. Cooks appeared to be more of a "helper" than an employee. (See attached Exhibit 2, 115:7-23).

6. Cooks filed a lawsuit against Publix, alleging that Publix failed to maintain its store in a reasonably safe condition. (D.E. 22, ¶24).

7. Publix settled the lawsuit with Cooks. (D.E. 22, ¶27).

8.      Publix then filed a lawsuit against S-L for Breach of Contract based on allegations that S-L breached its duty to defend, indemnify, and procure insurance. (D.E. 22, ¶¶35-60).

9.      Publix's claims are based on the following provisions of two "Continuing Guaranty and Indemnity Agreement (Products)" it entered into with S-L on November 23, 2005, and March 3, 2017 ("the Publix-Snyder's Agreements") which contain exceedingly broad language:

> In consideration of Publix permitting [S-L's] or our employees or agents from time to time to enter upon Publix's premises to provide services or products or to place or maintain equipment on Publix's premises, We agree to indemnify and hold Publix harmless from any claim, suit, liability or loss **arising in any manner out of the presence**, services or other activities **of any of our employees, agents or contractors** or out of the performance, use or operation of our products or equipment, **except to the extent** such incident, occurrence or damage giving rise to the claim, suit or loss was caused **solely by the negligence of Publix or Publix's employees, agents or contractors**.
>
> . . .
>
> We agree to indemnify and hold Publix harmless from, and assume responsibility and expense for any investigation, litigation and/or settlement of any complaint, claim or legal action. Publix agrees to give prompt written notice of any such complaints, claims or legal actions and to cooperate in the defense of such complaints, claims or legal actions. The obligation to defend Publix stated herein is hereby deemed a separate and distinct obligation, fully severable from any other duty stated herein. Our duty to indemnify Publix under this Agreement attaches to all Goods supplied to Publix by us and will not terminate with the termination of this Agreement.

(D.E. 22, ¶¶13-15). (Emphasis added).

10.     Publix's theory of liability for its breach of contractual duty to indemnify claim appears to be that the slip and fall was not solely attributable to the negligence of Publix, but also to that of Mr. Cooks for not watching where he was walking. Thus, as the claim, suit, or loss was not **solely** caused by the negligence of Publix, its employees, agents, or contractors, S-L was contractually obligated to defend and indemnify it.

11.     However, despite the broad indemnification language in the Publix-Snyder's Agreement, it notably does not expressly provide that Publix can be indemnified for its own negligence where Snyder-s is not jointly liable. (D.E. 22).

12.     S-L, in turn, filed a Third-Party claim against Monahan for indemnification (Count I) and contribution (Count II). (D.E. 59, ¶¶29-38).

13.     Monahan is a distributor for S-L products. As such, it purchases products from S-L and distributes them in stores such as Publix (D.E. 59, ¶¶10-12).

14.     The governing document is an April 2, 2017, "Distributor Agreement". (D.E. 59, ¶12).

15.     The Distributor Agreement contains a far more restrictive indemnification clause by which Monahan must indemnify S-L for claims arising or resulting from the actions, omissions, or negligence of Monahan's employees. (D.E. 59, ¶27).

> [Monahan], on behalf of itself and its directors, officers, employees, shareholders, agents, representatives, successor and assigns, assumes all risks and liabilities for, and agrees to and shall, at its sole cost and expense, protect, defend, indemnify, and hold harmless S-L . . . from and

against any and all fines, rights, claims, third-party claims, costs, expenses (including reasonable attorneys' fees and court costs), demands, damages, punitive damages, actions, causes of action, suits, injuries, including death, loss of property, interest, penalties and other liabilities of every kind and nature, whether known or unknown, . . . **caused by, or in any manner arising** or resulting, directly or indirectly, **from**: **[Monahan]'s or its employees'** actions, omissions or negligence . . . .

(D.E. 59, ¶27) (emphasis added).

16.    Publix's corporate representative candidly admits that the unidentified liquid substance that Mr. Cooks slipped on was from a Publix associate dropping a bottle while stocking. (See attached Exhibit 3, 12:20-13; 16:24-17:9; 41:8-22).

Q. Did Publix determine how the floor became wet?

A. The CCTV shows how the floor became wet.

Q. How did that happen? Can you describe how that happened?

A. The CCTV shows that a container (inaudible) --

THE COURT REPORTER: I'm sorry?

THE WITNESS: The CCTV shows that a container of liquid was dropped.

. . .

BY MS. CONNORS:

Q. So you mentioned that a bottle of liquid had been dropped. Do you know who dropped the bottle of liquid?

A. It was a Publix associate stocking.

. . .

Q. If a Publix employee observes a liquid on the stockroom floor, what action are they expected to take?

A. They're expected to address a spill.

Q. And how do they address it?

A. They would clean it up.

Q. I'm sorry. It cut off. Clean it up, did you say?

A. They would clean up the spill.

Q. And how would they do that?

A. Whatever the spill warranted, so if it was a spill that needed to be mopped, they would mop it.

. . .

Q. So does Publix contend that it was a Snyder's product that spilled on the stockroom floor that Cooks fell in?

A. Not to my knowledge.

Q. Is it Publix's position that the Cooks' claim arose because Cooks was present to stock Snyder's products then?

MR. MOUNTFORD: Objection. Again, I think we're getting into legal theories here, Nicole. I'd loved to be able to keep this to just what happened, factual information for a fact witness.

BY MS. CONNORS:

Q. Is it Publix's position that any action by a Snyder's employee created the wet floor?

A Not to my knowledge.

. . .

(See attached Exhibit 3, 12:20-13; 16:24-17:9; 41:8-22).

## SUMMARY JUDGMENT STANDARD

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court should not grant summary judgment unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. To discharge this burden, the movant must point out to the court that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The court in *Matsushita Electric Industrial Co., Ltd.* further reasoned that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 599. According to the plain language of Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587.

Similarly, the Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 - 48 (1986), held that ". . . [t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphasis in original). Finally, and most relevant to the instant matter, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

## MEMORANDUM OF LAW

### A. Monahan is Entitled to Summary Judgment Based on the Undisputed Record Evidence that Jeremiah Cooks was not its Employee but an Independent Contractor

Monahan is entitled to summary judgment because the undisputed evidence shows that at all times Cooks was an independent contractors not subject to a sufficient level of control by Monahan to make him a servant/employee. Accordingly, Publix's claim against S-L cannot be said to have been "caused by, or in any manner arising or resulting, directly or indirectly, from: **[Monahan]'s or its employees'** actions, omissions or negligence". Here, neither S-L, nor Publix for that matter, has introduced any evidence that Monahan maintained sufficient control over Cooks to make him its employee, even if Cooks himself acted negligently (he did not). Moreover, the unrebutted testimony is that Cooks was an independent contractor.

Specifically, Michael Monahan's, Monahan's corporate representative, unrebutted testimony is that Cooks was not a Monahan employee, but an independent contractor. (D.E. xx.1, 13:3-6; 33:6-34:8; 37:14-23; 38:11-23; 55:14-56:20; 65:15-66:1). Although the issue of the existence of an agency is often for the factfinder in cases brought by an unrelated third party, summary judgment is still appropriate where a plaintiff fails to come forward with any evidence of control by the alleged principal over the alleged agent. *See, e.g., Dalia v. Elec. Realty Associates, Inc.*, 629 So. 2d 1075

(Fla. 3d DCA 1994) (affirming final summary judgment in favor of a franchisor because the record did not support the existence of an actual agency relationship). Although the underlying lawsuit concerned the right to employment assistance rather than a tort, the discussion of agency in the context of delivery drivers in the relatively recent decision in *McGillis v. Dep't of Econ. Opportunity*, 210 So. 3d 220 (Fla. 3d DCA 2017) is instructive.

In *McGillis*, the claimant was a former Uber driver who was denied employment assistance based on the decision of the Florida Department of Economic Opportunity concluding that he was not an employee under Florida law. The driver and Uber executed an agreement providing, *inter alia*, that the driver was an independent contractor. *Id*. at 222. The driver was required to use special software on his smartphone, consisting of two applications. *Id*. Drivers received a percentage of the fare charged to the passengers, and were paid weekly by direct deposit. *Id*. Notably, Uber supplied additional insurance coverage for commercial operation of the vehicle, but did not provide other benefits such as medical insurance, vacation pay, or retirement pay. At the end of each year, Uber sends each driver a Form 1099. *Id*.

In affirming the finding that Uber drivers are not Uber employees, the Third District Court of Appeal applied the traditional common law test for agency found throughout Florida jurisprudence in negligence cases. First, the court must look to the agreement of the parties and, where a provision disclaims an employer-employee relationship in favor of independent contractor status, that provision should be

honored unless it conflicts with another provision or actual practice indicates that it is not a valid indicator of status. *Id.* at 224. In examining actual practice, the court should consider the following ten factors:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>
> (f) the length of time for which the person is employed;
>
> (g) the method of payment, whether by the time or by the job;
>
> (h) whether or not the work is a part of the regular business of the employer;
>
> (i) whether or not the parties believe they are creating the relation of master and servant; and
>
> (j) whether the principal is or is not in business.

*Id.*

By far, the most important of these factors is the "extent of control". *Id.* In applying the ten factors with a focus on extent of control, the district court held that Uber drivers are not employees. *Id.* at 225-26.

Here, the parties' agreement unequivocally disclaims an employer-employee relationship. And the parties' actual practice reflects the written contract. As the Department here found, "the central issue is the act of being available to accept requests" and "[t]his control is entirely in the driver's hands." Drivers supply their own vehicles—the most essential equipment for the work—and control whether, when, where, with whom, and how to accept and perform trip requests. Drivers are permitted to work at their own discretion, and Uber provides no direct supervision. Further, Uber does not prohibit drivers from working for its direct competitors. Accordingly, we agree with the Department's assessment that,

> [a]s a matter of common sense, it is hard to imagine many employers who would grant this level of autonomy to employees permitting work whenever the employee has a whim to work, demanding no particular work be done at all even if customers will go unserved, permitting just about any manner of customer interaction, permitting drivers to offer their own unfettered assessments of customers, engaging in no direct supervision, requiring only the most minimal conformity in the basic instrumentality of the job (the car), and permitting work for direct competitors.

Additional facts of this case support this conclusion. For example, Uber sends each driver a Form 1099—an IRS form used to report payments to independent contractors. And Uber does not provide fringe benefits, such as medical insurance, vacation pay, or retirement pay.

The fact that Uber may deactivate a driver's account under certain circumstances does not mandate a contrary conclusion. And even though Uber's principal business is to provide transportation, this factor alone is not dispositive.

*Id*. (Citations omitted).

The question of whether a subcontractor is a servant/employee for vicarious liability purposes was also squarely addressed by the Fifth District Court of Appeal in

11

*Paul N. Howard Company v. Affholder, Inc.,* 701 So. 2d 402 (Fla. 5d DCA 1997).  In that case, the plaintiff sued the landowner, who settled with the plaintiff but sued the general contractor seeking indemnity on the grounds that the general contractor and its two subcontractors were negligent. *Id.* at 403. The general contractor attempted to pass through the indemnity claims to its subcontractors through a theory of common law indemnification. *Id.*

The trial court found that the claim against one subcontractor was precluded for issues not germane to this analysis. *Id.*  The other subcontractor moved to dismiss, arguing that if the cause of the injury to the plaintiff were due to its negligence, then the general contractor would have no responsibility for that negligence since the subcontractor was an independent contractor on the job. *Id.* The appellate court agreed, holding that the general contractor cannot be held vicariously, constructively, derivatively, or technically liable for the subcontractor's alleged negligence because the relationship is that of a contractor subcontracting with a subcontractor, and nothing more. *Id.* at 404. Accordingly, the Fifth District affirmed the order disposing of the general contractor's common law indemnity claims against the subcontractor.

> Despite [the general contractor's] allegations to the contrary, [it] cannot be held vicariously, constructively, derivatively, or technically liable for [its subcontractor's] alleged negligence. The relationship between [them] is that of general contractor (Howard) subcontracting with subcontractor/independent contractor (Affholder), and nothing more. [The general contractor's] attempt to characterize itself as a principal and [its subcontractor] as its agent so as to establish vicarious liability is unavailing. [The subcontractor] is correct that the primary factor to be decided with regard to whether an entity is an independent contractor is the degree of control exercised over the details of the work. In the instant

case, apparent from the parties' subcontract agreement, itself, [the subcontractor] was responsible for providing all labor, tools and equipment and was otherwise in control of the details of the project.

*Id*. (Citations omitted).

The foregoing opinions are consistent with decisions on the issue of agency under numerous circumstances that still come down to the same right to control question. For example, in the seminal decision in *Miami Herald Pub. Co. v. Kendall*, 88 So. 2d 276, 279 (Fla. 1956), the Florida Supreme Court found that a newspaper delivery boy was an independent contractor even though he followed a route. "True, there was some supervision by the publisher's representative but while the newsboy was actually making his deliveries, he was acting alone and was a specialist, at least to the extent of following his route, remembering the addresses of subscribers who were in good standing, and collecting and properly accounting for funds coming into his hands. The news carrier furnished his own instrumentality, a motorcycle. The length of the engagement, or rather the condition for termination of the engagement, was specified in the contract. The method of payment, that is by the subscriber to the newsboy, was the compensation received under the contract, and the newsboy became indebted for papers delivered to him by the publisher whether or not he collected from the subscriber. We do not doubt that distribution of newspapers is a part of the regular business of the publisher but there is no reason that this cannot be done by independent contract. From the contract it is clear to us that the parties believed they were making [the newsboy] an independent contractor." *Id. See also Williams v. Fort Pierce Tribune &*

*Claims Ctr.*, 667 So. 2d 174, 174 (Fla. 1995) (holding that the decision in *Kendall* remains viable); *Marcoux v. Circle K Stores, Inc.*, 773 So. 2d 1270 (Fla. 4th DCA 2000) (affirming summary judgment on the authority of, *inter alia*, *Kendall*); *King v. Hall*, 740 So. 2d 1241 (Fla. 3d DCA 1999) (same).

In *Madison v. Hollywood Subs, Inc.*, 997 So. 2d 1270 (Fla. 4th DCA 2009), the plaintiff brought a negligent security claim against a franchisor, Miami Subs, based on a crime committed in the parking lot of its franchisee. The plaintiff attached the franchise agreement to the complaint. The only control in the franchise agreement was "to insure uniformity in the standardization of products and services offered by the restaurant." *Id*. at 1270. However, the day to day operations (i.e., the job site operations) remained within the sole control of the franchisee.

The trial court dismissed the complaint and the Fourth District affirmed, relying on *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119 (Fla. 1995), and holding that the franchise agreement alone was enough to warrant dismissal and because of lack of control the franchisor was not responsible for this type of incident as a matter of law. *Id*. at 1271. In so holding the court distinguished the decision in *Springtree Properties, Inc. v. Hammond*, 692 So. 2d 164 (Fla. 1997), a case where the plaintiff's claim was based on the defective design of the premises but said design was determined by the franchisor and the franchisee was required to implement it. *Id*. at 1270-71.

Also instructive is the decision of the Fourth District Court of Appeal in *Ortega v. Gen. Motors Corp.*, 392 So. 2d 40 (Fla. 4th DCA 1980), where the trial court granted

summary judgment in favor of GMC, the franchisor, on the plaintiff's claims of vicarious liability for the negligence of its franchisee, South Bay. The plaintiff claimed that notwithstanding language in select provisions of the franchise agreement, other portions of the agreement gave GMC sufficient control over South Bay's day-to-day operations to create an ambiguity as to GMC's right to control that should be resolved by a jury. *Id.* at 42.

The provisions giving GMC control required South Bay to: "1) obtain GMC's approval of the location and design of the dealership premises; 2) remain open for business during days and hours which are customary for such businesses in the community and display on the dealership premises advertising signs of a type recommended by GMC; 3) follow a uniform system of accounting specified by GMC and make its records available for inspection by GMC at reasonable times; 4) establish a minimum owned net working capital prescribed by GMC and meet standards set by GMC as to sales and customer service; 5) maintain a parts department and a customer service department; 6) provide service for trucks sold by GMC dealers, including warranty service paid for by GMC; 7) obtain needed service training for members of its service department provided by GMC; 8) refrain from engaging in fraudulent conduct in its dealings with the public." *Id.*

In affirming the summary judgment in GMC's favor, the court explained that although the agreement conferred on GMC the right to control certain aspects of South Bay's business, the question for purposes of that case was limited to GMC's "right to

15

control the day-to-day operation of South Bay's business." *Id.* The court placed great emphasis on the fact that South Bay was independently owned and was responsible for hiring, firing, and supervising its employees.

> The owners of South Bay are required to invest a substantial sum of money in order to obtain and keep the dealership. From the ownership standpoint, therefore, South Bay is an independent and separate enterprise from GMC. **Independent ownership of a substantial enterprise is an important factor to be considered on the issue of control. An independent owner is less likely to submit to the control of others in the operation of its business than a non-owner**.

> In addition to being independently owned, South Bay is not regulated by the subject agreement in the hiring, firing or supervising of its employees. South Bay exclusively determines these matters, as well as the wages and other employee benefits provided to its employees. When it buys trucks, parts and accessories from GMC, South Bay obtains title to them and resells them at prices determined by negotiation with its customers. Sales, use or similar taxes on resales of trucks, parts and accessories are the sole responsibility of South Bay. The agreement also recognizes that South Bay has the ultimate responsibility for the successful operation of the dealership.

*Id.* at 42-43.

Accordingly, the court found that as a matter of law, South Bay was not an agent of GMC under the franchise agreement of the parties. *See id.* at 43 (citing similar cases from around the country including *Arnson v. General Motors Corp.*, 377 F.Supp. 209 (N.D. Ohio 1974); *Quijado Corp. v. General Motors Corp.*, 253 A.2d 538 (D.C.Ct.App.1969); *American Motors Sales Corp. v. The Superior Court*, 16 Ariz. App. 494, 494 P.2d 394 (1972); *Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59 (9th Cir. 1973); *Washington v. Courtesy Motor Sales, Inc.*, 48 Ill.App.2d 380, 199 N.E.2d 263

(1964); *Smith v. Ford Motor Co.*, 327 S.W.2d 535 (Mo.App.1959); *Westerdale v. Kaiser-Frazer Corp.*, 6 N.J. 571, 80 A.2d 91 (1951). *Paige-Detroit Motor Car Co. v. Pintado*, 82 Fla. 210, 89 So. 549 (1921); *Drum v. Pure Oil Co.*, 184 So.2d 196 (Fla. 4th DCA 1966)).

Based on the foregoing, there is a complete absence of any evidence that Monahan had the requisite level of control over Cooks for Cooks to be considered other than an independent contractor and not a Monahan employee. Because Cooks was at no time Monahan's employee, and the controlling indemnification clause in the Distributor Agreement is only triggered through the negligence, acts, or omissions of Monahan or its employees, any alleged negligence committed by Cooks is insufficient to either trigger S-L's indemnification rights nor used to impute liability to Monahan for a contribution claim as a matter of law. *Paul N. Howard Co. v. Affholder, Inc.*, 701 So. 2d 402, 404 (Fla. 5th DCA 1997).

## B. Monahan is Entitled to Summary Judgment on the Claim for Indemnification as a Matter of Law

Even if Mr. Cooks is considered its employee, Monahan is entitled to summary judgment on S-L's claim for indemnification because the underlying indemnification claim by Publix against S-L fails as a matter of law. Accordingly, any claim for indemnification by S-L against Monahan necessarily fails as well. Simply put, as there is no underlying liability against S-L, any claim by S-L arising from that liability necessarily fails.

It is undisputed that Mr. Cooks's underlying claim against Publix is from a slip and fall on a transient foreign substance that was only on the ground due to the

negligence of Publix. There is no evidence (or even allegations) of any additional parties, connected to S-L or otherwise, that were responsible for the substance being on the ground (by Publix's own admission). Somehow, Publix has attempted to turn its own sole negligence into a right of indemnification because it may or may not have been able to reduce Mr. Cooks's recovery by raising a defense of comparative fault had Publix not settled the claim. Thus, according to Publix, its negligence was not the sole proximate cause of the incident, thereby triggering the broad indemnification clause against S-L. However, Mr. Cooks's own comparative fault does not make an indemnitor like S-L a joint tortfeasor nor jointly and severally liable with Publix any more than Mr. Cooks was a joint tortfeasor. He was simply a third party who was injured whom Publix alleges should have seen the substance before stepping in it.

It is well-settled in Florida that a party may not be indemnified for its own negligence based on general language in an indemnification agreement. *See Sanislo v. Give Kids the World, Inc.*, 157 So. 3d 256, 264-65 (Fla. 2015). Such provisions will only be enforced where the indemnification agreement itself expresses an intent that the indemnitor will indemnify the indemnitee for their own negligence. *See, e.g., Leonard L. Farber Co., Inc. v. Jaksch*, 335 So. 2d 847 (Fla. 4th DCA 1976) (upholding an indemnification agreement whereby a lessee indemnifies a lessor for the entire amount of the underlying claim when liability is joint and several); *Church & Tower of Florida, Inc. v. Bellsouth Telecommunications, Inc.*, 936 So. 2d 40 (Fla. 3d DCA 2006) (affirming summary judgment and upholding indemnification agreement where contractor, as

indemnitor, agreed to indemnify the indemnitee for any acts arising from the indemnitee's negligence); *Florida Power & Light Co. v. Mid-Valley, Inc.*, 763 F.2d 1316, 1319 (11th Cir. 1985) (upholding an indemnification agreement because it "satisfies Florida's strict test applicable to cases where the indemnitee's sole negligence caused the damage").

Publix's theory of indemnification liability in this case turns this concept on its head in large part because Publix is conflating a claim for negligence with the defense of comparative fault. The elements of a cause of action for negligence are: duty, breach, causation, and damages. *Clay Elec. Co-op., Inc. v. Johnson*, 873 So.2d 1182, 1185 (Fla. 2003). The threshold inquiry in any negligence action is the legal question of whether the defendant owed a duty of care to the plaintiff; i.e., "whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm **to others**." *McCain v. Fla. Power Corp.*, 593 So.2d 500, 502 (Fla. 1992). (Emphasis added). If no reasonable duty has been abrogated, no negligence can be found. *See Cassel v. Price*, 396 So. 2d 258 (Fla. 1st DCA 1981).

Conversely, a plaintiff such as Mr. Cooks may be comparatively at fault without the presence of each of these elements. Thus, even when a plaintiff such as Mr. Cooks fails to look out for himself and is injured, thereby requiring that his own recovery be reduced, he is not liable for an independent claim of negligence unless he breached a duty to an "other" causing that "other" to also suffer damages. While there are certainly cases, particularly automobile accidents, in which both a plaintiff and a

defendant may suffer damages from each other's negligent conduct, there is no evidence or even allegation that anyone other than Mr. Cooks suffered damages in his slip and fall. Thus, Mr. Cooks's conduct does not satisfy the elements of a claim for negligence, there is no party who suffered damages as a result of his alleged failure to see the substance other than himself, and the only negligent party involved in the slip and fall is Publix. Although the language of the Publix-Snyder's Agreement arguably permits Publix to be indemnified for its own negligence when both Publix and S-L are jointly and severally liable (or to use comparative fault terms both guilty of conduct that contributed to the injury of an "other"), that is simply not the case here as there was no breach of duty by Mr. Cooks resulting in his damages for which either he or S-L was jointly and severally liable. As the indemnification clause does not expressly permit Publix to be indemnified for its sole negligence, it may not be so indemnified here. Any claim of negligent training, whether by S-L or Monahan, is a red herring, as such claims only arise when a defendant's failure to train results in harm to a third party. Furthermore, the idea that failing to tell an adult to watch where they're going is a training deficiency is preposterous on its face and certainly does not create a jury question on negligent training. As a result, the claim by Publix against S-L fails, and S-L's claim for indemnification necessarily fails as well.

Moreover, assuming *arguendo* that the Publix-Snyder's Agreement would permit indemnity in favor of Publix, and further assuming that Cooks can be considered an employee of Monahan, the language of the Distributor Agreement is

more restrictive than the one contained in the Publix-Snyder's Agreement. Specifically, under the Distributor Agreement between S-L and Monahan, S-L is only entitled to indemnification for claim arising or resulting from Monahan's actions, omissions, or negligence. (D.E. 59, ¶27).  This case, however, does not arise from Cooks's actions, omissions, or negligence, but from that of Publix.

Based on the foregoing, Monahan is entitled to the entry of final summary judgment on the Third-Party Claim for indemnification.

### C. Monahan is Entitled to Summary Judgment on the Claim for Contribution as a Matter of Law

Monahan is also entitled to summary judgment on the claim for contribution, even if Mr. Cooks is considered its employee.  In order to prevail on a claim for contribution, "the claimant must allege a common liability to the injured party." *Horowitz v. Laske*, 855 So. 2d 169, 174 (Fla. 5th DCA 2003). The injured party here is Jeremiah Cooks. There is no evidence of any negligence on the part of Monahan that contributed to Mr. Cooks slipping and falling on a wet floor while at Publix. In fact, the uncontested evidence is that the dangerous condition, the wet floor, was solely the result of Publix's negligence. Even if the broad nature of the indemnification clause in the Publix-Snyder's Agreement requires Snyder's to indemnify Publix, it does not mean that Monahan has a common liability for Cooks's injuries, just that S-L left itself vulnerable by agreeing to such a sweeping indemnification clause. Finally, any claim for contribution is premature in any event. Pursuant to Florida Statutes section 768.31, which is titled Contribution Among Tortfeasors:

(d) If there is no judgment for the injury or wrongful death against the tortfeasor seeking contribution, the tortfeasor's right of contribution is barred unless she or he has either:

1. Discharged by payment the common liability within the statute of limitations period applicable to claimant's right of action against her or him and has commenced her or his action for contribution within 1 year after payment, or

2. Agreed, while action is pending against her or him, to discharge the common liability and has within 1 year after the agreement paid the liability and commenced her or his action for contribution.

Fla. Stat. 768.31(4)(d).

Because there is no evidence that a judgment was entered into against S-L, nor that S-L made any payment or agreed to discharge common liability against it, any potential claim for contribution (there is no potential for such a claim) has not accrued.

Based on the foregoing, there is no dispute of material fact and Third-Party Defendant, M. MONAHAN DISTRIBUTORS, LLC, is entitled to summary judgment as a matter of law.

## III.    Conclusion

In conclusion, based on the pleadings and the documents produced in this matter, Third-Party Defendant, M. MONAHAN DISTRIBUTORS, LLC, respectfully requests that this Honorable Court enter an Order granting this Motion for Summary Judgment, as there are no genuine issues of material fact and Third-Party Defendant is entitled to judgment as a matter of law.

## LOCAL RULE 3.01(G) CERTIFICATION

We hereby certify pursuant to Local Rule 3.01(g)(1) there is no duty to confer

on Third-Party Defendant, M. Monahan Distributors, LLC's Motion for Summary

Judgment.

Dated the 1st day of June 2026.

LUKS, SANTANIELLO, PETRILLO,
COHEN & PETERFRIEND
Counsel Third Party Defendant,
M. Monahan Distributors, LLC
301 W. Bay Street, Suite 1010
Jacksonville, FL 32202
Telephone: (904) 791-9191
Facsimile: (904) 791-9196


By:    */s/ Deana N. Dunham*
       DEANA N. DUNHAM,
       Florida Bar No.: 103699
       ddunham@insurancedefense.net
       mhall@insurancedefense.net
       luksjaxpleadings@insurancedefense.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of June 2026, I certify that the

foregoing document is being served this day on all counsel of record via electronic mail

on the attached Service List.

By:    */s/ Deana N. Dunham*
       DEANA N. DUNHAM,
       Florida Bar No.: 103699

## SERVICE LIST

Derek K. Mountford, Esq.
Joseph W. Jacquot, Esq.
GUNSTER, YOAKLEY &
STEWART, P.A.
1 Independent Drive, Suite 2300
Jacksonville, FL 32202
dmountford@gunster.com;
jjacquot@gunster.com;
MDaniels@gunster.com;
wpruim@gunster.com


Alyssa F. Chamberlin, Esq.
GUNSTER, YOAKLEY &
STEWART, P.A.
Brickell World Plaza, Suite 3500
Miami, FL 33131
achamberlin@gunster.com;
jandersondavis@gunster.com

Robert H. Friedman, Esq.
230 Sunrise Avenue, B-202
Palm Beach, FL  33480
rob@friedmanpa.com;
ruth@friedmanpa.com
Attorneys for Publix Super Markets,
Inc.

Lucas H. Goda, Esq.
Rhett C. Parker, Esq.
Erin M. Raschke, Esq.
Phelps Dunbar LLP
100 S. Ashley Drive, Suite 2000
Tampa, FL 33602
Attorneys for The Continental Ins Co.
lucas.goda@phelps.com
rhett.parker@phelps.com
erin.raschke@phelps.com

Jerrel K. Crocker, Esq.
Nicole T. Connors, Esq.
Tiffany Bustamante, Esq.
Cozen O'Connor
200 S. Biscayne Blvd., Ste 3000
Miami, FL 33131
Attorneys for Snyder's Lance, Inc.
jcrocker@cozen.com
nconnors@cozen.com
tbustamante@cozen.com
luehara@cozen.com

James M. Kaplan, Esq.
Noah E. Snyder, Esq.
Kaplan Zeena LLP
2 S. Biscayne Blvd., Ste. 3050
Miami, FL 33131
Attorneys for Hartford Fire Insurance
Company
james.kaplan@kaplanzeena.com
noah.snyder@kaplanzeena.com